**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 11-0401-WS-M |
| | ) | |
| THE COOPERATIVE DISTRICT OF THE | ) | |
| CITY OF SPANISH FORT – HIGHWAY | ) | |
| 98 PUBLIC FACILITIES, | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on plaintiff's Motion for Preliminary Injunction (doc. 3). The Motion has been briefed and is now ripe.[1] Also pending are certain jurisdictional challenges raised by defendant and putative intervenors.

**I.     Relevant Background.[2]**

Although the Complaint recites nearly 20 pages of facts and the parties' written submissions labor under detailed accounts of the underlying and interlocking complex

---

[1]     The Rule 65 Motion is being taken under submission without a hearing. Circuit precedent contemplates that hearings must be held on motions for preliminary injunction only where there are contested issues of fact that require credibility determinations. *See, e.g., Four Seasons Hotels and Resorts, B.V. v. Cosorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003) (explaining that an "evidentiary hearing is not always required before the issuance of a preliminary injunction" unless "facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue") (citations omitted). Not only have the parties not identified credibility issues or disputed facts that might warrant a hearing, but they have also submitted a compendium of Joint Stipulated Documents and Facts (doc. 17) setting forth relevant agreed facts for resolution of the motion.

[2]     Nothing herein is intended to be, or should be construed as, final judicial findings of fact for the duration of this matter. In reciting pertinent background facts, the undersigned relies heavily on the parties' Joint Stipulated Documents and Facts, which are themselves subject to various express caveats and disclaimers that apply with equal force to the factual discussion herein. Moreover, the Court recognizes that the putative intervenors strenuously disagree with certain of those stipulated facts. This Order does not preclude them (or anyone else) from contesting facts as this action moves forward, should they be permitted to intervene.

transactions, relationships and agreements giving rise to this dispute, the basic facts of what transpired and why we are here are relatively straightforward.

In early 2007, financing arrangements were made for construction and development of a project popularly known as Spanish Fort Town Center and located at the intersection of U.S. Interstate 10 and U.S. Highway 98 in Spanish Fort, Alabama (the "Project"). (Stipulated Facts (doc. 17-1), ¶ 4.) The Project, which includes retail tenants, an apartment complex and hotels, required certain public infrastructure improvements. (*Id.*, ¶ 5.) Defendant, The Cooperative District of the City of Spanish Fort-Highway 98 Public Facilities (the "District"), is an Alabama public corporation that was formed, in part, for the purpose of financing those public infrastructure improvements. (*Id.*, ¶¶ 3, 6.) In furtherance of that responsibility, in March 2007 the District issued Public Improvement Revenue Bonds, Series 2007, in the aggregate principal amount of $30.5 million (the "Bonds"). Although the Bonds passed through various hands, plaintiff, U.S. Bank National Association ("U.S. Bank"), is the trustee of a New York law trust (the "Certificate Trust") into which 100% of the Bonds have been deposited. (*Id.*, ¶¶ 19-20.)

In issuing the Bonds, the District entered into an agreement (the "Trust Indenture") with non-party Regions Bank, and also adopted an authorizing resolution. (*Id.*, ¶¶ 12, 15.) These documents specify the following arrangements for financing and administering the Bonds: (i) the District is responsible for redeeming and making debt service payments on the Bonds; (ii) to meet this obligation, the District levies a license or excise tax on all businesses operating at the Project at initial rates of 1.5% of gross retail sales and 4% of hotel room rental fees (collectively, the "License Fees");[3] and (iii) the District agreed to establish and maintain a reserve fund (the "Reserve Fund") in the minimum amount of $2,287,500, which could be tapped to bridge any shortfall if accrued License Fees proved inadequate to pay interest and principal coming due on the Bonds. (*Id.*, ¶¶ 25-30.)[4]

---

[3]    Those License Fees are in addition to generally applicable taxes and fees applicable to retail and hotel transactions in Spanish Fort, Alabama.

[4]    The District's duties to make debt service payments and avoid default are enumerated in the Trust Indenture, which provides that "[t]he District will pay or will cause to be paid, but solely out of the License Fee Proceeds, the principal of and the interest and premium (if any) on the Series 2007 Bonds as specified therein … and it will not default hereunder." (*Id.*, ¶ 27.)

Regrettably, there have been persistent, substantial shortfalls between the License Fees generated by commercial activity at the Project, on the one hand, and the debt service payments owed on the Bonds, on the other.[5]  Over time, this deficit has eaten away at the Reserve Fund.  In March 2011, the Reserve Fund balance dipped below the minimum amount of $2,287,500, with a deficiency of $840,280.15 that remains today.  (*Id.*, ¶¶ 40-41.)  The transaction documents contemplated that the project owner, non-party Cypress Equities I, L.P. ("Cypress"), would replenish the Reserve Fund to maintain the minimum reserve balance; indeed, Cypress unconditionally guaranteed that it would do so.  (*Id.*, ¶¶ 31-32.)  But when the balance fell below the minimum threshold in March 2011, Cypress failed to deposit the necessary funds to restore the minimum balance in the Reserve Fund.  (*Id.*, ¶¶ 42-45.)  This problem has not yet blossomed into a default of the District's debt service obligations; however, such a default is forecast to occur in March 2012 if the status quo remains in effect.

Faced with these circumstances, in the spring of 2011 non-party MMA Realty Capital ("MMA"), the servicer under the Certificate Trust (of which plaintiff is trustee and into which all of the Bonds have been deposited), invoked a provision in the Trust Indenture enabling the bondholders to compel an increase of License Fee rates in certain circumstances.  (*Id.*, ¶¶ 46-50.)[6]  MMA originally requested that the License Fees be increased at the Project from 1.5% to

---

[5]      For example, according to materials in the record, License Fee collections for the March 2010 – March 2011 period totaled $941,142, as compared to March 2011 – March 2012 debt service obligations of $2,602,975.  (*Id.*, ¶ 46.)  Thus, it appears that the receivable License Fees have been greatly eclipsed by the payable principal and interest on the Bonds.

[6]      That provision, which is Section 10.3 of the Trust Indenture, reads as follows:

"The District will increase the rate of the License Fee but only as directed by the Holders of not less than 66-2/3% in principal amount of the Series 2007 bonds provided that (1) if the Guaranty is in effect, the Guarantor has been requested by the Trustee to advance moneys to the District under the Guaranty and the Guarantor has failed to honor the Guaranty or (2) if the Guaranty is no longer in effect, the Reserve Fund falls below the Minimum Reserve Requirement.  If such a shortfall occurs, the District will increase the rate of the License Fee as directed by the Holders of not less than 66-2/3 in principal amount of the Series 2007 Bonds to a level that would yield at least 100% of the maximum annual debt service requirement with respect to the Series 2007 Bonds for the next succeeding Bond Year.  The District will increase the rate of the License Fee not later than ninety days after directed to do so by the Holders of not less than 66-2/3% in principal amount of the Series 2007 Bonds."  (*Id.*, ¶ 35.)

-3-

4.5% on retail purchases, and from 4% to 12% on hotel stays, with the idea that the tripling of these rates was necessary to yield 100% of the annual debt service requirement needed for the Bonds for next succeeding year. (*Id.*, ¶ 46.)[7]  MMA communicated this directive to the District by no later than April 12, 2011. (*Id.*, ¶ 50.)

Upon receipt of MMA's directive, the District conducted a series of meetings of its Board of Directors in April, June and July, with MMA, its counsel, and various other stakeholders being represented at, and participating in, such meetings. (*Id.*, ¶¶ 52-61.)  To date, the District has neither granted nor rejected MMA's April 12 proposal for increasing License Fee rates. (*Id.*) On July 14, 2011, the District issued Resolution No. 2011-1 (the "Resolution"), outlining the District's position that it faces overlapping statutory and contractual duties as to any possible increase in the License Fees, that "the information submitted to it thus far is conflicting, incomplete and largely intended to advance the interests of the respective parties," and that "insufficient information has been made available to enable the District to comply with its statutory and contractual duties." (*Id.*, ¶ 62; doc. 17, Exh. R, at 5.)[8]  The Resolution stated the District's intent to hire an economic advisor to study these issues and to advise the District on "the optimum rate increase (if any) or other means of revenue generation under the circumstances." (*Id.*)  Pursuant to the Resolution, the District has retained and is awaiting the report of an economic advisor, specifically Dr. Semoon Chang, Director of the Center for Business & Economic Research at the University of South Alabama. (Joint Stipulation (doc. 17-1), at ¶ 63.)

U.S. Bank elected not to wait for the District's information-gathering process and ultimate decision on the directed License Fee rate hike.  One week after the District adopted the

---

[7]     MMA later tempered this request somewhat, by reducing the directive to increases on the License Fees from 1.5% to 4.1% on retail sales, and from 4% to 8% on hotel rental fees. (*See* doc. 1, Exhs. L, M.)

[8]     The Resolution explained that the deficiencies in information related to the effects of increasing the License Fee rates in the magnitude directed by MMA, and the potential that such increases could backfire by reducing gross retail sales, threatening the viability of certain tenants at the Project, and ultimately reducing or negating any benefit to the District of increased License Fee rates. (*Id.* at 4-5.)  The Resolution also expressed concern that increasing the License Fee rates as proposed by MMA might run afoul of the District's statutory mandate to fix and revise only "reasonable" rates and fees. (*Id.*)

Resolution, U.S. Bank filed its Complaint (doc. 1) and Motion for Preliminary Injunction (doc. 3) against the District in this court.  The Complaint sounds in declaratory judgment, preliminary/ permanent injunction, and specific performance for the District's purported breach of its obligations under the Trust Indenture.  The thrust of the Complaint is U.S. Bank's contention that the District was contractually required to raise the License Fee rates when the bondholders (or more accurately MMA, on their behalf) so instructed it in April 2011, and that the District's tactics of consulting Dr. Chang, gathering information, and not acting promptly to execute the directive are neither contemplated nor authorized by the Trust Indenture.  At the heart of this lawsuit, then, U.S. Bank seeks enforcement of Section 10.3 of the Trust Indenture against the District.[9]

## II.    Subject Matter Jurisdiction.

Before reaching the merits of the Motion for Preliminary Injunction, the Court must consider a pair of jurisdictional issues posited by other litigants.[10]  *See generally Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1092 (11th Cir. 2010) ("[O]nce a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue.") (citation omitted); *University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999) ("the district court should have resolved the issue of subject matter jurisdiction before reaching the merits of any other issue").

---

[9]      Plaintiff does not request an award of monetary damages; rather, the Complaint on its face demands only a declaration, injunction, or order of specific performance compelling the District to increase the License Fee rates as specified by the bondholders.

[10]      One of these jurisdictional issues was interjected by Andrew Bolnick and Bank of America, N.A., neither of which has been formally joined as a party at this time.  Bolnick and Bank of America's Motion to Intervene (doc. 18) filed on August 17, 2011 is pending, has not been briefed, and will not be considered until after a ruling has issued on the Rule 65 Motion. Notwithstanding Bolnick and Bank of America's status as mere putative intervenors, the Court can neither ignore nor defer the subject-matter jurisdiction challenge they have raised.  After all, federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it."  *Hertz Corp. v. Friend*, --- U.S. ----, 130 S.Ct. 1181, 1193, 175 L.Ed.2d 1029 (2010); *see also Williams v. Chatman*, 510 F.3d 1290, 1293 (11th Cir. 2007) ("Federal courts are obligated to inquire into subject-matter jurisdiction *sua sponte* whenever it may be lacking.") (citation and internal quotation marks omitted).

## A.    *Appeal of State Agency Decision.*

The putative intervenors maintain that subject-matter jurisdiction is lacking because U.S. Bank's Complaint is properly framed as an appeal of the District's administrative actions, not as a breach of contract action.  According to the putative intervenors, "[a]t its core, U.S. Bank's complaint is a direct attack on the actions taken by the local administrative agency."  (Doc. 18, at 2.)  The facts and circumstances before the Court at this time do not support a finding that jurisdiction is barred by such a theory.

It is well established that federal district courts do "not sit to review on appeal action taken administratively or judicially in a state proceeding."  *Chicago, R.I. & P.R. Co. v. Stude*, 346 U.S. 574, 581, 74 S.Ct. 290, 98 L.Ed. 317 (1954).  On that basis, many courts of appeals have "held that federal district courts are without jurisdiction to review on appeal findings of state agencies."  *Fairfax County Redevelopment & Housing Authority v. W.M. Schlosser Co.*, 64 F.3d 155, 157 (4th Cir. 1995).[11]  But nothing before the Court conveys any reasonable likelihood that the District is a "state agency" conducting "state proceedings."  *See* Ala. Code § 41-22-3 (for purposes of Alabama Administrative Procedure Act, term "agency" does not include "any agencies of local governmental units, unless they are expressly made subject to this chapter by general or special law").  Moreover, on its face, the Complaint is not tantamount to an appeal of findings made by the District in administrative proceedings.  By all appearances, the District has made no findings and has conducted no administrative or judicial proceedings.

In short, as presently framed, this action does not appear to fit within the narrow parameters of the *Stude* line of authority; therefore, there is no reason to believe that this action is an impermissible appeal of state agency findings that lies outside the scope of federal diversity jurisdiction.  Far from being an appeal of administrative or judicial proceedings, this action arises from U.S. Bank's allegations that the District entered into certain contractual commitments that it subsequently breached.  Nothing in that fact pattern or procedural posture constitutes, or even

---

[11]    The Supreme Court has distinguished between "whether a cause of action for judicial review of a state administrative decision is within the district courts' original jurisdiction under the diversity statute" (which falls under the rule in *Stude*) and "whether it is a claim within the district courts' pendent jurisdiction in federal question cases" (which does not).  *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 169, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997).  The latter circumstance plainly does not apply here, inasmuch as there is no federal question presented and U.S. Bank's sole jurisdictional hook is § 1332.

resembles, an appeal of a state agency's findings in administrative or judicial proceedings. As such, this jurisdictional challenge is not well taken.

**B.      *Trustee's Citizenship and Diversity Jurisdiction.***

The Complaint predicates federal subject-matter jurisdiction on the diversity provisions of 28 U.S.C. § 1332, inasmuch as U.S. Bank maintains that the action involves citizens of different states and the amount in controversy exceeds $75,000. In particular, plaintiff alleges that U.S. Bank is a citizen of Ohio for diversity purposes, that the District is a citizen of Alabama, and that the amount in controversy threshold is met because this action concerns the level of the Reserve Fund, which presently has a deficiency of $840,248.15 from its minimum balance requirement. (Complaint (doc. 1), ¶¶ 2-4.) The District questions whether U.S. Bank's citizenship is properly considered for diversity purposes, or whether that of all of the Certificate Trust's beneficiaries, certificate holders, and/or members must be examined in gauging the presence or absence of diversity jurisdiction.

As a general proposition, it is true that "unincorporated associations do not themselves have any citizenship, but instead must prove the citizenship of each of their members to meet the jurisdictional requirements of 28 U.S.C. § 1332." *Osting-Schwinn*, 613 F.3d at 1086. But the Certificate Trust is not the named plaintiff in this case. U.S. Bank is. That distinction may be important. The Supreme Court has made clear that "active trustees whose control over the assets held in their names is real and substantial" are permitted "to sue in their own right, without regard to the citizenship of the trust beneficiaries." *Carden v. Arkoma Associates*, 494 U.S. 185, 191, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990) (quoting *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 465-66, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980)). So if the "trustee is the real party to the controversy," then it may sue in its own name, and the trust beneficiaries' citizenship is irrelevant to the § 1332 diversity inquiry. *Carden*, 494 U.S. at 192.[12] Where a trustee is not a "mere conduit[] for a remedy flowing to others," but itself "manage[s] the assets" and "control[s]

---

[12]      For diversity purposes, then, it is crucial to determine whether the trustee is the real party in interest. "This is because a party who has no real interest in the outcome of the litigation should not be able to use its citizenship to transform a local controversy into a federal case." *CCC Information Services, Inc. v. American Salvage Pool Ass'n*, 230 F.3d 342, 346 (7th Cir. 2000); *see also Broyles v. Bayless*, 878 F.2d 1400, 1402 (11th Cir. 1989) ("This hurdle prevents a party with an insufficient interest in the litigation from using his or her citizenship to transfer a local controversy into one within federal diversity jurisdiction and vice-versa.").

the litigation," that trustee is entitled to file suit in its own right, and diversity jurisdiction is assessed by reference to that trustee's citizenship rather than that of the trust beneficiaries. *Navarro*, 446 U.S. at 465-66; *see also Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 200-01 (3rd Cir. 2007) ("In a suit by … individual trustees of a trust, where the trustees possess certain customary powers to hold, manage and dispose of assets, their citizenship, and not that of the trust beneficiaries, is controlling for diversity of citizenship purposes.") (citation and internal quotation marks omitted).[13]

The critical jurisdictional question is whether U.S. Bank's role and responsibilities as to the Certificate Trust satisfy the standards prescribed by *Navarro* and its progeny.  Defendant suggests that U.S. Trust is not an active trustee with real and substantial control over trust assets, but that it is instead "little more than a paying agent whose duties are ministerial in nature." (Doc. 21, at 13.)  In support of this position, the District points to the Trust Agreement for the Certificate Trust, including provisions specifying U.S. Bank's rudimentary functions of making deposits, distributing documents, providing account statements, and so on.  (Doc. 1, Exh. D.)

Independent review of the Trust Agreement reveals that U.S. Bank's authority as trustee appears tightly circumscribed.  Section 2.04 provides that "[t]he Trustee has no obligations with respect to the Bonds except as otherwise expressly provided in this Agreement."  (Doc. 1, Exh. D, § 2.04(a).)  To be sure, U.S. Bank is to hold the Bonds; indeed, the Trust Agreement states that the Bonds will be delivered to the Trustee, and that the Trustee "may hold Bonds in its account at DTC or any other Securities Depository or in its own custody."  (*Id.*, § 2.03(a), (c).) But U.S. Bank's authority and ability to act as to those Bonds appears quite limited by the Trust

---

[13]    By contrast, if the trust (and not the trustee) is the real party in interest, then the fact that U.S. Bank is diverse from the District is not dispositive of the diversity of citizenship inquiry.  *See Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1339 (11th Cir. 2002) ("Trust funds … are not citizens of any particular state; rather, the citizenship of trust fund *members* is determinative of the existence of diversity of citizenship."); *Dixon v. DB50 2007-1 Trust*, 2010 WL 5174758, *3 (M.D. Ga. Dec. 15, 2010) ("for diversity of citizenship purposes, a trust is a citizen of each state in which it has at least one beneficial owner").  The record is devoid of information concerning the citizenship of the Certificate Trust's members, beneficiaries, and/or certificate holders.  Inasmuch as these issues are not squarely presented now, the Court makes no findings and expresses no opinions at this time as to which category or categories of such persons would be relevant to a determination of the Certificate Trust's citizenship, much less whether those persons are diverse from the District.

Agreement.  Under § 3.02(a), the Trustee cannot act on any request for "amendment, modification, waiver or other action modifying any Bonds," or on any "written solicitation for any action with respect to any Bonds," without first mailing notice to, and requesting instructions from, all certificate holders of record, and must then act "in accordance with the instructions given, or not given." (*Id.*)  That provision also specifies that U.S. Bank cannot consent to any matter altering the timing or amount of Bond payments without unanimous consent of certificate holders. (*Id.*)  Similarly, the Trust Agreement appears to proscribe U.S. Bank from directing "the Bond Trustee to exercise remedies with respect to any of the Bonds" unless directed to do so by the certificate holders. (*Id.*, § 3.02(b).)  The Trust Agreement further provides that, other than as stated in §§ 3.02(a) and (b), U.S. Bank "shall not take any action as the nominal holder or owner of any of the Bonds, either alone or as part of a group of holders or owners of such Bonds, except in accordance with the affirmative direction of the Holders of [the certificates] … after notifying such Holders of such action in writing." (*Id.*, § 3.02(c).)

These provisions, considered as a whole, imply that U.S. Bank's power to manage assets and control litigation is illusory, and that the certificate holders actually pull the strings and make all meaningful decisions in that regard, with U.S. Bank merely charged with carrying out their wishes.  This observation, in turn, implies that U.S. Bank does not possess the sort of real and substantial control over the assets required by the *Navarro* Court to render it a real party in interest capable of suing in its own name.  After all, the Supreme Court has explained that "a trustee is a real party to the controversy for purposes of diversity jurisdiction when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others." *Navarro*, 446 U.S. at 464-65 (trustee was real party in interest where it operated under declaration of trust authorizing it to take legal title to trust assets, to invest those assets, and to sue and be sued in its capacity as trustee, with beneficiaries having no voice in investment decisions and no ability to control disposition of this action or to intervene in affairs of the trust).[14]  U.S. Bank's power and authority appears far more narrowly cabined than that conferred

---

[14]      *See also Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 124 (2nd Cir. 2008) (finding diversity jurisdiction based on trustee's citizenship where "the express terms of the Trust agreement place full responsibilities and powers over the litigation in the Trustees, and we have no reason to believe that these terms of the agreement are not being honored").

on the trustee in *Navarro*.  Rather than managing the assets, controlling the litigation, and calling the shots, U.S. Bank's role appears much more akin to a mere conduit, doing only what the certificate holders tell it to do.

In response to the District's jurisdictional challenge, plaintiff counters that U.S. Bank has a "panoply of rights and responsibilities" set forth in the Trust Agreement, that U.S. Bank "has full authority to sue to enforce its rights as trustee," and that it, "in its capacity as the holder of the bonds, is alone entitled to direct the bond trustee or the District, as bond issuer, regarding … any direction to increase the rates of the License Fees."  (Doc. 23, at 3.)[15]  Plaintiff does not cite to any specific portion of the Trust Agreement delineating such rights and responsibilities, such as its purported authority to sue to enforce its "rights as trustee," nor does it identify any evidence that U.S. Bank actually controls this litigation or manages the Certificate Trust's assets itself.  Moreover, it is unclear how U.S. Bank's purported status as holder of the Bonds confers upon it sole authority to direct the District to increase License Fee rates, particularly given the restriction in § 3.02(c) of the Trust Agreement on U.S. Bank's ability to take <u>any</u> action as holder of the Bonds without affirmative direction from the certificate holders.[16]

In short, U.S. Bank's showing does not reveal the sort of "real and substantial control" necessary for it to be able to sue in its own right, without regard to the citizenship of members, certificate holders and/or beneficiaries of the Certificate Trust.  Of course, "[t]he burden for establishing federal subject matter jurisdiction rests with the party bringing the claim."  *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005).  For the reasons stated, U.S. Bank has not satisfied that burden.  That said, the Court cannot say with certainty

---

[15]     This last point (*i.e.*, that U.S. Bank is "alone entitled" to direct the District to increase License Fees) is somewhat perplexing, given the stipulated facts that MMA (the servicer of the Certificate Trust) and not U.S. Trust actually gave those directives.  That tension will be left for another day.

[16]     Plaintiff's reliance on Rule 17(a) of the Federal Rules of Civil Procedure is inadequate, in and of itself, to resolve the jurisdictional quandary.  *See, e.g., Navarro*, 446 U.S. at 462-63 n.9 (noting that Rule 17(a) and rule that diversity jurisdiction depends upon citizenship of real parties to controversy "serve different purposes and need not produce identical outcomes in all cases"); *Associated Ins. Management Corp. v. Arkansas General Agency, Inc.*, 149 F.3d 794, 796 (8th Cir. 1998) ("the Federal Rules of Civil Procedure have no bearing on the requirements of federal diversity jurisdiction") (citations omitted); Rule 82, Fed.R.Civ.P. (stating that Federal Rules of Civil Procedure do not extend the jurisdiction of the federal district courts).

that plaintiff cannot meet this burden and satisfy the *Navarro* test.  This is particularly true given the parties' limited treatment of jurisdictional issues in their briefs, which were submitted under a highly compressed timetable and were understandably focused on the merits of U.S. Bank's Motion for Preliminary Injunction, rather than the accompanying jurisdictional concerns.[17]

In recognition of these circumstances, and to ensure that plaintiff has a fair and reasonable opportunity to be heard and to present evidence that its authority and responsibility vis a vis the Certificate Trust are sufficient to render it the real party in interest for diversity purposes, the Court will allow supplemental briefing on this jurisdictional issue.  The Motion for Preliminary Injunction will remain pending in the interim, inasmuch as the Court cannot and will not rule on the propriety of Rule 65 relief until such time as it has resolved this substantial threshold question of whether federal diversity jurisdiction exists.

**III.   Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.    On or before **September 6, 2011,** plaintiff must submit a supplemental memorandum (supported by authority and exhibits as appropriate) addressing the diversity of citizenship issue;

2.    Any response by defendant must be filed on or before **September 13, 2011**, at which time the jurisdictional issue will be taken under submission; and

3.    If the Court determines that plaintiff has met its burden of showing the existence of federal subject-matter jurisdiction, the undersigned will take the pending Motion for Preliminary Injunction (doc. 3) under submission without a hearing, and will contemporaneously enter a briefing schedule as to the Motion to Intervene (doc. 18) filed by putative intervenors Andrew Bolnick and Bank of America, N.A.

DONE and ORDERED this 26th day of August, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[17]    In that vein, it bears noting that the District raised its jurisdictional challenge not in the form of a Rule 12(b) motion to dismiss, but as one of a host of issues presented in its written response to plaintiff's Rule 65 motion.